# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

NICKEY LEE POUND, SR.,

        Petitioner,   :        Case No. 3:13-cv-083

  - vs -        District Judge Walter Herbert Rice
        Magistrate Judge Michael R. Merz

WARDEN, Lebanon Correctional Institution,

        Respondent.   :

## SUPPLEMENTAL REPORT AND RECOMMENDATIONS

This habeas corpus case is before the Court on Petitioner's Objections (Doc. No. 4) to the Magistrate Judge's Report recommending dismissal with prejudice under Rule 4 of the Rules Governing § 2254 Cases  (Doc. No. 2).  Upon initial consideration of the Objections, Judge Rice has recommitted the case under Fed. R. Civ. P. 72(b) (Doc. No. 5).

**Use of Rule 4**

Pound first objects to the application of Rule 4 to this case, "rather than the traditional process of Return of Writ and Traverse." (Objections, Doc. No. 4, PageID 47.)  Rule 4 of the Rules Governing § 2254 Cases (the "Habeas Rules") reads in its entirety:

> The clerk must promptly forward the petition to a judge under the court's assignment procedure, and the judge must promptly examine it. If it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court, the judge must dismiss the petition and direct the clerk to

1

> notify the petitioner. If the petition is not dismissed, the judge must order the respondent to file an answer, motion, or other response within a fixed time, or to take other action the judge may order. In every case, the clerk must serve a copy of the petition and any order on the respondent and on the attorney general or other appropriate officer of the state involved.

The Advisory Committee Notes on the adoption of Rule 4 in 1976 note that it is carrying out the requirement of 28 U.S.C. § 2243 to determine if the Petitioner is not entitled to relief before ordering an answer.  The Committee went on to note "under § 2243 it is the duty of the court to screen out frivolous applications and eliminate the burden that would be placed on respondent by ordering an unnecessary answer."  Thus although obtaining a return of writ and a traverse (called "answer" and "reply" in the Habeas Rules) may be more usual or "traditional," the Habeas Rules themselves contemplate that there will be cases which can and should be adjudicated on initial review.  The Supreme Court has recently endorsed this view:  "[F]rivolous petitions should occasion instant dismissal." *McQuiggin v. Perkins*, 569 U.S. ___, 133 S. Ct. 1924, 185 L. Ed. 2d 1019, 1035 (2013).

**Actual Innocence Claim:**

Pound is asserting a claim of actual innocence.  He believes that the fact he is making that particular kind of claim excuses all of the procedural defaults found by the Magistrate Judge in the Report.

Pound was convicted in the Montgomery County Common Pleas Court on August 29, 1997, of aggravated murder, attempted murder, felonious assault, improperly discharging a firearm into a habitation (all with firearm specifications) and having weapons under disability.

(Petition, Doc. No. 1, PageID 1-2.)  The convictions were affirmed on direct appeal in *State v. Pound*, 1998 Ohio App. LEXIS 4364 (Ohio App. 2nd Dist. 1998).  The Ohio Supreme Court then declined to conduct further review.  (Petition, Doc. No. 1, ¶ 9.  The case became final on direct review ninety days later when Petitioner's time to apply to the United States Supreme Court for a writ of certiorari expired.

Petitioner filed a new trial motion in the Common Pleas Court which was construed as a petition for post-conviction relief and denied April 15, 1999.  *Id.* at ¶ 11.  Pounds filed additional petitions for post-conviction relief in that court on February 1, 2008; June 29, 2009; and January 3, 2011.  *Id.* at PageID 4, 6.

Pound's claim that Elvis Wooliver perjured himself at trial was raised by Pound for the first time in his new trial motion in 1999.  The Second District Court of Appeals found he had procedurally defaulted that claim by (1) not raising it on direct appeal to the extent it was supported by evidence of record and (2) by Pound's failure to appeal from denial of the new trial motion.  *State v. Pound*, 2012 Ohio 3392, 2012 Ohio App. LEXIS 2983 ¶¶ 9-10 (Ohio App. 2nd Dist. 2012).  As noted in the Report, both of those procedural defaults are based on Ohio procedural rules which have been found by the federal courts to be adequate and independent bases for state court decisions, thereby satisfying the standard for enforceable procedural defaults. (Report, Doc. No. 2, PageID 37 citing *Guilmette v. Howes,* 624 F.3d 286, 290 (6th Cir. 2010)(*en banc*); *Eley v. Bagley*, 604 F.3d 958, 965 (6th Cir.), *cert. denied sub nom, Eley v. Hauk,* __ U.S. __, 131 S.Ct. 822 (2010); *Reynolds v. Berry*, 146 F.3d 345, 347-48 (6th Cir. 1998), *citing Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *accord Lott v. Coyle*, 261 F.3d 594, 601-02 (6th Cir. 2001); *Jacobs v. Mohr*, 265 F.3d 407, 417 (6th Cir. 2001)).

The court of appeals found additional procedural defaults in the fact that Pound's second,

third, and fourth petitions were untimely under Ohio Revised Code § 2953.21(A)(2). *State v. Pound*, 2012 Ohio 3392, 2012 Ohio App. LEXIS 2983 ¶10 (Ohio App. 2nd Dist. 2012). Finally, the court found an additional procedural bar in Pound's failure to appeal the trial court judgment of March 3, 2010. *Id.*

Pound asserts his actual innocence "will excuse an untimely Petition filed beyond the one-year Statute of Limitations period, as this Petitioner clearly is." (Objections, Doc. No. 4, PageID 47, citing *Souter v. Jones,* 395 F.3d 577 (6th Cir. 2005).) The *Souter* precedent has been displaced by the Supreme Court's decision in *McQuiggin, supra*.

> [A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in *Schlup* and *House*, or, as in this case, expiration of the statute of limitations. We caution, however, that tenable actual-innocence gateway pleas are rare: "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup*, 513 U. S., at 329, 115 S. Ct. 851, 130 L. Ed. 2d 808; see *House*, 547 U. S., at 538, 126 S. Ct. 2064, 165 L. Ed. 2d. 1 (emphasizing that the *Schlup* standard is "demanding" and seldom met). And in making an assessment of the kind *Schlup* envisioned, "the timing of the [petition]" is a factor bearing on the "reliability of th[e] evidence" purporting to show actual innocence. *Schlup*, 513 U. S., at 332, 115 S. Ct. 851, 130 L. Ed. 2d. 808.
>
> * * *
>
> [A] federal habeas court, faced with an actual-innocence gateway claim, should count unjustifiable delay on a habeas petitioner's part, not as an absolute barrier to relief, but as a factor in determining whether actual innocence has been reliably shown.

185 L. Ed. 2d at 1027.

The threshold question for this Court, then, is whether Pound has presented a persuasive case of actual innocence. In support of his Petition, Pound offers first his own Affidavit of December 22, 2010, which asserts that

4

> 3) he did not, at any time, have or fire the assault rifle which was responsible for the death of Mr. Krimm; . . .
>
> 5) the girl-friend of the perjurer called the trial judge during the trial to inform him that the testimony given by her boyfriend was perjured;
>
> 6) this fact is part of the trial transcripts;

(Attached to Petition, Doc. No. 1, PageID 17.)  Pound then offers summaries of testimony in the trial transcript, although the actual transcript pages are not tendered. *Id.* at PageID 18.  Next is an undated unsworn letter from someone who signs himself "Elvis," purportedly to a John W. Coile, an inmate at Ohio's Lebanon Correctional Institution. *Id.* at PageID 21-22.  Elvis purports to love "Dogg" (an alias of Pound's) like a father and to be working to get him out, but he does not confess to perjuring himself at trial.

Next is an unsworn letter dated November 23, 1997, to "Dad" and signed "Blue," an alias for Pound's son. *Id.* at PageID 23-24.  This letter also does not, even if it were sworn, provide any proof of Wooliver's purported perjury or of Pound's innocence.

Next is another letter from Blue to Dad dated November 10, 1997. *Id.* at PageID 25-27. Blue apologizes for what he did to his father, to wit, putting him in prison for life.  He does not say what that was, nor does he say anything about any perjured testimony.

Next is a October 12, 1999, Affidavit from William Hefner who avers that he was in prison with Elvis Wooliver in July-August, 1988.  During that conversation, Wooliver purportedly admitted to Hefner that

> 1) He, Pound, and Pound's son Nick Pound, Jr. [Blue] were co-defendants in the case.
>
> 2) "Nick Pound, Jr., was the person who had the assault rifle that night.  He also said that there was no plan to hurt anyone, only

5

> to shoot the house and it was an accident that the people were shot, as Nick Pound Sr. testified at trial.
>
> 3)   Elvis also said that he had lied at Nick Pound Sr.'s trial and said that he and Nick Pound Jr. would testify that the assault rifle was in the hands of Nick Pound Sr. that night.
>
> 4)   Elvis said that if Nick Pound Jr. got an appeal that he would tell the story truthfully and not lie as he did at trial.

*Id.*. at PageID 28. PageID 29 is another affidavit which cannot be read, but appears to be from inmate Gary Houtz, who also signed the Affidavit which appears at PageID 30. He states that he celled with Wolliver in the Montgomery County Jail in October-December, 1996, and Wooliver told him:

> 5)   It was an accident that the people were shot and the other two defendants, who had not yet been arrested were Dog and Dog's son Blue.
>
> 6)   "He then told me that Blue had the assault rifle and that Dog has [sic] the 22 cal. rifle and he had the shotgun.

*Id.*

Next is the June 23, 1999, Affidavit of Darren Freeman, then incarcerated at the Madison Correctional Institution. Freeman avers:

> (2) In November 1997, Nick Pound Sr, and I were standing in the chow line at the correction receiving center, waiting to be feed [sic], when out of nowhere inmate Elvis, approaches Nick Pound Sr, and begines [sic] saying "I am really sorry about what happened at your trial," and elvis further stated that he should have told the truth that Nick Pound Jr. was the one who killed Tim Krimn, but he felt that nick pound jr, deserved his loyalty because of there [sic] long standing friendship, so he (elvis) said he chose to lie and say that nick sr, did it.
>
> (3) Elvis went on to say that if nick sr, got an appeal he would tell the truth, and why he lied which led to the conviction of nick pound sr.

6

*Id.* at PageID 31.

Next is a February 5, 2009, Affidavit of inmate Mark Layman. Layman avers that at some undisclosed time he talked to Wooliver in Dayton, presumably at Dayton Correctional Institution and

> Elvis Wooliver, Jr. told me that he lied at Nick Pound Sr.'s trial. Stating that Pound Sr. had the assault rifle which Elvis said it was Pound Junior that had the assault rifle. Pound Sr. had a 22 caliber rifle and he himself had the shotgun, and that it was an accident anyone was shot. He also said he was the only one that could get Pound Sr. a new trial because he lied at the trial. He also stated that he was threatened by the detectives and the prosecutor into saying Pound Sr. had the assault rifle. He also said that he stated this Pound Sr.'s trial.

*Id.* at PageID 32.

In affirming the conviction on direct appeal, the Second District Court of Appeals found the following facts:

> Nickey Lee Pound, Sr., a.k.a. "Dog," was tried and convicted of aggravated murder, attempted murder, felonious assault, and improperly discharging a firearm at or into a habitation, each with firearm specifications. He also pleaded guilty to having weapons while under disability. The trial court sentenced him accordingly, and Pound appeals.
>
> The indictment stated that, on July 13, 1996, Pound had committed the offenses of aggravated murder, in violation of R.C. 2903.01(A), against Tim Krimm; attempted murder, in violation of R.C. 2903.02(A) and 2923.02(A), against Mark Krimm; felonious assault, in violation of R.C. 2903.11(A)(2), against Patrick Nuckles; improperly discharging a firearm at or into an occupied structure, in violation of R.C. 2923.161(A); and having weapons while under disability, in violation of R.C. 2923.13(A)(2). The trial court entered a plea of not guilty on Pounds' behalf. On August 19, 1997, the first day of trial, Pound withdrew the prior plea of not guilty to the offense of having weapons while under disability and pleaded guilty to that offense.
>
> The evidence presented at trial established the following facts.

Two weeks prior to the date of the charged offenses, Pound and Tim Krimm were arguing in the parking lot of Slammers, a bar in Huber Heights, Ohio where Tim Krimm worked as a "bar back." Pound approached Tim Krimm, who backed away and then hit Pound in the head with a flashlight, causing his eyeglasses to break. Pound subsequently attempted to contact Tim Krimm at Slammers to get money for his glasses. At approximately 1:00 a.m. on July 13, 1996, Pound, his son, Nickey Lee Pound, Jr., a.k.a. "Blue" ("Blue"), and Elvis J. Wooliver went to Slammers. Blue and Wooliver started playing pool while Pound sat down nearby and drank beer. Wooliver pointed out to Pound that Tim Krimm was behind the bar. Pound approached Tim Krimm and asked him for money, but Tim Krimm ignored him. On Pound's behalf, Nuckles also asked Tim Krimm to pay for the broken glasses, but Tim Krimm refused. At closing time, Tim Krimm walked out the back door of Slammers to avoid further confrontation with Pound. Tim and Mark Krimm, their girlfriends, Nuckles, Donald Vanover, and Sue Lannom went back to Tim Krimm's house, located at 713 Hart Street in Dayton, Ohio. Everyone except Tim Krimm was sitting on the porch when Pound, Blue, and Wooliver arrived at 713 Hart Street. Pound got out of the car and walked up onto the porch. Tim Krimm, who had been inside his house, came to the front door with a gun, pointed it at Pound, and ordered him to get off his property. Pound backed up, walked to the car, and got inside. Tim Krimm continued to point the gun in the direction of the car as it was driven away. Pound, Blue, and Wooliver stopped the car at a gas station, and Pound telephoned his friend Carl Burba to inquire about borrowing some guns. They drove to Burba's house, and Burba provided them with three guns: a .223 caliber semiautomatic rifle ("the assault rifle"), a .22 caliber semiautomatic rifle ("the .22 caliber rifle"), and a shotgun. Burba loaded the clips of the assault rifle and the .22 caliber rifle. He also supplied ammunition for the shotgun and disposable gloves.

With the guns in the trunk, Pound, Blue, and Wooliver headed back to Tim Krimm's house. They parked the car in a nearby alley and walked toward the house, each carrying a gun. At that time, Tim and Mark Krimm and Nuckles were outside on Tim Krimm's porch, while their friends were inside the house. Although the evidence was in dispute over who had carried and fired which gun, the person with the assault rifle fired several rounds of shots in the direction of the front porch and hit Tim Krimm, who had been standing on his porch steps. A bullet wound to the head caused Tim Krimm's death. Mark Krimm was shot in the leg, and Nuckles escaped physical injury. The person with the .22 caliber rifle stood in the alley and fired shots toward the east wall of the house, and

8

> bullets penetrated that wall but did not injure anyone inside the house. After the shooting had stopped, Pound, Blue, and Wooliver ran back to the car, drove away, and took the guns to a friend's apartment. With the help of Pound's friend Smokey, they invented an alibi for their whereabouts at the time of the shooting.

*State v. Pound,* 1998 Ohio App. LEXIS 4364, *1-4. (2nd Dist. 1998)(Wolff, J.).  Blue and Wooliver obtained plea agreements and pleaded guilty to involuntary manslaughter, felonious assault, and (in Wooliver's case) obstructing justice.  *Id.* at *4-5.  Part of the plea agreements was that each of them would testify truthfully at trial.  The court of appeals' analysis shows that it was Pound who had the running feud with Tim Krimm and the announced intention to shoot at Krimm's house after Krimm, armed with a gun, told Pound to get off his property.  *Id.* at *10-11.

None of the facts recited by the court of appeals is disputed by Pound except the finding that he was the one who fired the assault rifle, a bullet from which killed Tim Krimm.  Pound's claim of actual innocence, as the Court understands it, is that, while he was a co-conspirator with Blue and Wooliver in the shooting, he did not fire the assault rifle which expelled the fatal bullet.

Pound's claim of actual innocence is completely unpersuasive.  From the facts found by the court of appeals which are not contradicted by anything presented by Pound with his Petition, it was he who had the grudge with Krimm, he who went to Krimm's house and was confronted with a firearm, he who procured all three weapons from someone named Burba, and he who went back to Krimm's house and fired at it with some kind of firearm.  At trial Blue and Wooliver both testified Pound had the assault rifle.  Neither one of them has provided an affidavit repudiating his trial testimony.  Even Pound's affidavit does not say Blue had the assault rifle, but only that Pound did not.

"To be credible, such a claim [of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory

9

scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." *Schlup*, 513 U.S. at 324. Pound presents none of these things. His claim is that Wooliver has admitted perjuring himself to a number of other prison inmates and, in the last affidavit presented with the Petition[1], that he was pressured to do so by detectives and the prosecutor. Despite the inference Pound wants the Court to draw, we do not know that Blue was apologizing to his father for saying Pound had the assault rifle; he may have been apologizing for agreeing to testify at all. In any event, he has not given an affidavit admitting either perjury or firing the assault rifle.

In *MsQuiggin* the Supreme Court instructs trial courts to consider the timeliness of a petitioner's filing an actual innocence claim as part of weighing its credibility. Like the petitioner in *McQuiggin*, Pound waited many years to file his habeas petition: the crime here occurred July 13, 1996, and the petition was not filed until March 18, 2013, nearly seventeen years later. Pound explains his delay by stating that the trial court took three years to rule on his post-conviction petition (Objections, Doc. No. 4, PageID 48). But he does not explain why he filed four separate post-conviction petitions in the Ohio courts when Ohio has a limit on successive post-conviction petitions and his second, third, and fourth petitions were found to be untimely. That is, he does not explain why he did not come to federal court when he had exhausted his available state court remedies.

Although the delay is unexplained, it does little to detract from the rest of the evidence of actual innocence because that evidence is so slim. The Court is not informed of whether the various affiants are all still in prison and therefore available or whether their recollection of

---

[1] Pound presents the April 16, 2013, Affidavit of inmate Robert Shane Ritchie recounting a January, 2012, conversation with Wooliver to the same effect as prior affidavits. Pound offers no explanation as to why he could not have obtained this Affidavit in time to submit it with the Petition. Considering that Affdiavit now, it adds nothing of substance to the actual innocence claim.

Wooliver's admissions may have dimmed.  The bottom line is that,  if neither Blue nor Wooliver has retracted his trial testimony under oath, the evidence that it was Pound who had the assault rifle is sufficient to convict.

Even if Pound had persuasive evidence that he did not fire the shot that killed Tim Krimm, it is not clear that this would exonerate him of Krimm's murder.  As Judge Wolff noted on direct appeal, it was Pound who had the motive and Pound who devised the scheme to acquire lethal weapons and then, along with Wooliver and Blue, discharged them into an occupied structure, killing the person against who the scheme was directed, as well as wounding another.  This is sufficient evidence under Ohio law for Pound to be convicted as an aider and abettor of his son, assuming Blue had the assault weapon.

Pound also faults the Court for not giving him an evidentiary hearing on his actual innocence claim (Objections, Doc. No. 4, PageID 49).  In *McQuiggin*, the Supreme Court does not discuss the interaction between that decision and its holding in *Cullen v. Pinholster,* 563 U.S. ___, 131 S.Ct. 1388 (2011).  However, it strongly suggests that a habeas petitioner who claims actual innocence must present at least a colorable actual innocence claim to pass through the *Schlup* gateway.  *McQuiggin*, 185 L. Ed. 2d at 1033.  Were this not so, a habeas petitioner could plead actual innocence in completely conclusory terms (e.g. "I didn't do it.") and obtain a full trial of that claim in federal court.  This would turn habeas corpus jurisprudence on its head and be inconsistent with the Supreme Court's observation in *McQuiggin* and *Schlup* that persuasive actual innocence claims will be rare.

Pound has not presented a persuasive claim of actual innocence.  Therefore, he has not excused either his state court procedural defaults which are enumerated in the Report or his failure to file within the statute of limitations.  The Magistrate Judge therefore again

recommends that the Petition be dismissed with prejudice, that Pound be denied a certificate of appealability, and that this Court certify to the Sixth Circuit that an appeal would not be taken in objective good faith.

June 17, 2013.

s/ *Michael R. Merz*
United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).